**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **JOSEPH F. ROBERTSON,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 14 C 319 |
| ) | |
| **CAROLYN COLVIN**, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Joseph Robertson ("Robertson") seeks judicial review pursuant to the Social Security Act

("Act"), more specifically 42 U.S.C. § 405(g),[1] of the final decision by Acting Commissioner of

Social Security Carolyn Colvin ("Commissioner") that denied Robertson's claim for

supplemental security income ("SSI") under Title XVI of the Act.  Robertson and Commissioner

have filed cross-motions for summary judgment under Fed. R. Civ. P. ("Rule") 56, and

Robertson has alternatively moved to remand for further proceedings.  For the reasons stated

here, both Rule 56 motions are denied, but Robertson's alternative motion to remand is granted.

### Procedural Background

Robertson filed an application for both Title II and Title XVI benefits on November 8,

2010, alleging a disability onset date of November 17, 2009 (R. 154-68).  After his application

for SSI was denied on April 7, 2011 (R. 70, 72), Robertson filed a request for reconsideration on

---

[1]  All further statutory references will take the form "Section --," using the Title 42
numbering rather than the Act's internal numbering. All portions of 20 C.F.R. will be cited "Reg.
§ --."  Citations to the record are denoted "R. --."

June 8, 2011 (R. 77).[2]  That request was denied on October 11, 2011 (R. 80).  Robertson then

made a timely filing for a hearing, which Administrative Law Judge ("ALJ") Janice Bruning held

on August 23, 2012 (R. 47).  At that hearing Robertson, his wife and a vocational expert testified

(R. 47).  On November 7, 2012 the ALJ issued a decision denying Robertson's application

(R. 24-39).  Robertson then requested review from the Appeals Council, which denied that

request on November 7, 2012 (R. 2-5), so that ALJ Bruning's opinion represents Commissioner's

final decision.  This action was timely filed on January 14, 2014.

## Background and Medical Evidence

At the time of the hearing Robertson was 44 years old (see R. 47, 70) and was married

with two children (R. 49).  Robertson suffers from osteoarthritis (see, e.g., R. 720) and has

undergone four major surgeries on his neck, knee and hips.  Following a car accident Robertson

had spinal surgery in 2008 to address "cervical myeloradiculopathy due to cervical spondylosis"

(disease of the spinal cord and nerve roots due to degeneration of the spine[3]) (R. 344, 349).  In

July 2009 he had surgery on his right knee for a work-related injury (R. 397, 401).  He has also

had two hip surgeries -- one on the right side in June 2010 (R. 625-27) and one on the left side in

October 2011 (R. 761).  In addition to those physical ailments Robertson has psychological

impairments, including major depressive disorder, intermittent explosive disorder and antisocial

personality disorder (see, e.g., R. 660).  This opinion will first detail the record evidence of

Robertson's physical and mental impairments and will then review the hearing testimony.

---

[2]  Elsewhere in the record the filing date of Robertson's request for reconsideration is
denoted as June 9, 2011 (see, e.g., R. 80), but because the ALJ adopted the June 8 date (R. 24)
this Court uses that date as well.

[3]  See Stedman's Medical Dictionary (28th ed. 2006) ("Stedman's") at 1270 and "Cervical
Spondylosis," *Mayo Clinic*, Jun. 12, 2012, http://www.mayoclinic.org/diseases-
conditions/cervical-spondylosis/basics/symptoms/con-20027408l.

## Robertson's Physical Impairments

At the crux of Robertson's appeal are his hip problems.  Robertson's first hip surgery was occasioned by an on-the-job injury as well as pre-existing hip disease (R. 493).  That surgery addressed a tear in the cartilage lining his right hip socket (a "labral tear"[4]), another low-grade partial-thickness tear of the ligamentum teres and a "congenital cam lesion" on the right femur (R. 528-29).  Cam lesions are structural deformities at the junction of the femoral head and neck that damage the hip socket.[5]  In the process of examining Robertson's right hip problems, doctors also identified non-work-related problems with the left hip, including congenital cam lesions and avascular necrosis (the death of bone tissue[6]) (R. 618).

Following his right hip surgery in June 2010, Robertson continued to suffer pain in both hips (see, e.g., R. 520, 607, 609).  He walked with an "obvious gait deviation" favoring the right leg, which necessitated use of a cane (R. 607).  Some months after the surgery doctors also noted that the right femoral head exhibited sclerosis (the hardening of bone tissue[7]), which potentially indicated avascular necrosis there too (R. 608).

After Robertson applied for SSI in late 2010, the Bureau of Disability Determination Services ordered an Internal Medical Consultative Examination, which was conducted in

---

[4]  "Hip Labral Tear," *Mayo Clinic*, Apr. 23, 2014, http://www.mayoclinic.org/diseases-conditions/hip-labral-tear/basics/definition/con-20031062.

[5]  "Advanced Arthroscopic Techniques for Multiple Hip Disorders," *Mayo Clinic*, http://www.mayoclinic.org/medical-professionals/clinical-updates/orthopedic-surgery/advanced-arthroscopic-techniques-multiple-hip-disorders (last visited Feb. 9, 2015).

[6]  "Avascular necrosis," *Mayo Clinic*, May 4, 2012, http://www.mayoclinic.org/diseases-conditions/avascular-necrosis/basics/definition/con-20025517.

[7]  Stedman's at 606 and 1733.

February 2011 (R. 662).  At that time Robertson displayed a limited range of motion in his hips and could walk only 25 feet unassisted and less than 50 feet with the aid of a cane (R. 664-65). Robertson also reported that he was taking Norco, a prescription pain medication used to relieve moderate to severe pain,[8] as well as Ibuprofen (R. 663).  Just a month later a medical consultant echoed those findings in a Physical Residual Functional Capacity ("RFC") Assessment, but the consultant still concluded that Robertson had the ability to sit about 6 hours in an 8 hour workday (R. 686).

After those examinations Robertson continued to suffer bilateral hip problems and significant pain from 2011 to 2012 (see, e.g., R. 720, 721,722, 736).  In August 2011 orthopedic surgeon Dr. Treister remarked that "[w]hatever was done surgically [on Robertson's right hip] . . . has not helped the patients [sic] right hip pain at all" (id.) and that the right hip surgeon should have performed additional surgery because it appeared that hip also had avascular necrosis (R. 736).  Although Dr. Treister diagnosed Robertson with bilateral avascular necrosis (on both the right and left sides) in August 2011 (R. 737), he reversed that diagnosis as to the right hip on September 8 (R. 756) after reviewing an MRI record dated September 7 that found no evidence of necrosis there (R. 765-66).

In October 2011 Dr. Treister performed Robertson's second hip surgery -- core drilling to address avascular necrosis on the left side (R. 761).  But even after that surgery and up through the hearing in August 2012, Robertson's hip pain persisted (see, e.g., R. 703, 713, 715, 716, 717, 718) -- his doctor even referred him to a pain clinic (R. 716).  Bolstering Robertson's allegations of pain is the fact that he continuously took prescription pain medication (see, e.g., R. 715, 718, 719) throughout that period -- eventually his doctor had to counsel him "about risk of long term

_____

[8] "Norco," *Drugs.com*, http://www.drugs.com/norco.html (last visited Feb. 9, 2015).

use of opioid pills" and suggested that he "could control pain with meds that are not opiods" (R. 712). And even though doctors concluded that Robertson's left avascular necrosis had healed, his left femur appeared "suspicious for healed avascular necrosis" with some structural irregularity (R. 725). In April 2012 Robertson was told that he would have to undergo yet another surgery (R. 714).

Due to his physical impairments Robertson has not been able to return to work and his daily functioning is greatly impaired. Robertson's aunt testified that he had "trouble getting up out of bed" and was "unable to sleep" because of "his hips hurting all the time" (R. 286), that he "always needs assistance walking" (R. 288) and that he partakes in few social activities outside of spending time with his family (R. 289). One medical consultant concluded that Robertson was "[u]nable to function independently daily in any respects" (R. 679), largely on account of his physical constraints.

### Robertson's Mental Impairments

Robertson's December 7, 2011 psychic evaluation contains a doctor's notes that he was born with brain damage and that at age one his father threw him against the wall (R. 706). He was later diagnosed with a learning disability and dropped out of high school in tenth grade (R. 658). Since high school he has served prison terms of 18 months for burglary in 2001 and of one year in 2005 for a parole violation and "battery to a cop" (R. 659).

Robertson's record in the current case reflects significant mental impairments consistent with that history. During his psychological consultative examination in February 2011 the examiner diagnosed Robertson with major depressive disorder, intermittent explosive disorder and an antisocial personality disorder, and the examiner also noted that he had marked impairments in his ability to concentrate and pay attention (R. 660). He assessed Robertson's

Global Assessment of Functioning ("GAF") at 40, though a later assessment deemed it 50

(R. 660, 707).  GAF scores describe an individual's overall ability to function, with scores of 40

to 50 signaling "[s]erious symptoms . . . or any serious impairment in social, occupational, or

school functioning (e.g., no friends, unable to keep a job)" (Am. Psychiatric Ass'n, Diagnostic &

Statistical Manual of Mental Disorders ("Manual") (4th ed. text revision 2000) at 32.[9]  Robertson

also told the examiner that he periodically suffered panic attacks, was housebound due to

agoraphobia and had suicidal thoughts (R. 659).

During the next month another psychological consultant assessed Robertson's mental

RFC and, in contrast to the examiner's findings of the previous month, concluded that Robertson

had only a "moderate" limitation on his ability to maintain concentration and attention (R. 681).

He further concluded that Robertson could "complete 1-2 step tasks in a work setting that does

not involve routine interactions with others" (R. 682).

## Hearing Testimony

Robertson testified that he continues to suffer hip problems (R. 51) and, despite taking

pain medication (R. 56), continues to experience pain that significantly limits his daily

functioning (R. 53-54, 56-60).  He said he can sit for only about 20 minutes and stand for only

about 15 minutes at a time and that he has to rest after walking even half a block with his cane

(R. 53).  According to both Robertson and his wife, she must often help her husband dress and

bathe (R. 56, 62).  Pain not only impacts his mobility, but it also disrupts his sleep -- keeping him

awake for three or four days at a time (R. 56) -- and his ability to socialize.  Robertson testified

that he could not attend his children's basketball games, church or concerts, or even go out to eat

_____

[9] Although the American Psychiatric Association has discontinued GAF scores as a
metric (Manual (5th ed. 2013) at 16), the GAF score was still in use at the time doctors examined
Robertson.  Hence this opinion incorporates the definitions that were then relevant.

(R. 59). He did state that he occasionally assisted with household chores like vacuuming or dusting (R. 58), that he could drive "a little bit" (R. 56) and that he took his son to school daily (R. 58).

To assess Robertson's RFC, the ALJ also posed a series of hypothetical questions to a vocational expert ("VE"). ALJ Bruning began by asking whether there were sufficient jobs for an individual who could sit for a total of 6 hours a day, 45 minutes at a time with 2 minute breaks in between, and who was limited to three-to-four step simple repeated tasks (R. 65).[10] According to the VE there was a significant number of sedentary jobs available for such a person. ALJ Bruning then asked whether someone with those limitations would be able to maintain a job if he was consistently absent two or more days per month, and the VE responded "no" (R. 66). Additionally the VE said that if an individual were off-task for over 20 percent of the workday due to pain, the individual would likely lose his position (R. 66).

### ALJ Bruning's Decision

Although ALJ Bruning's discussion of her findings occupies nearly a dozen pages (R. 26-37), this summary provides an ample basis for an evaluation by this Court:

1. Robertson had not engaged in any substantial gainful activity since November 8, 2010, the protective filing date of the application.

2. Robertson suffered from severe impairments comprising avascular necrosis, bilateral hips; status post-core decompression surgery, left hip; status post-surgical repair labral tear and low-grade partial thickness tear of ligamentum teres, right hip; status post-surgical repair of medial meniscus tear, left knee; depression; and antisocial disorder.

3. Robertson's impairments did not meet or medically equal the severity of any of listed impairments 1.02 ("Major dysfunction of a joint(s)"), 12.04 ("Affective disorders") and 12.08 ("Personality disorders").

---

[10] There were other limitations that are not enumerated here because they are not essential to this opinion.

4. Robertson had the RFC to perform sedentary work with limitations, including among other things that he must sit no more than 6 hours and stand no more than 2 hours in a normal 8 hour workday, with the option to stand for 1 to 2 minutes every 45 minutes, and that he be limited to routine three-to-four step tasks in a work environment where there is only occasional contact with supervisors and co-workers but no contact with the public.

5. Robertson is unable to perform any past relevant work.

6. Because he was 42 years old on the date he filed his application, Robertson is classified as a "younger individual" (the span for that classification runs from age 18 to age 44).

7. Robertson has a limited education and is able to communicate in English.

8. Transferability of job skills is not material to the disability determination, because even if Robertson had no transferable skills he would not qualify as disabled.

9. Robertson has the RFC to perform certain sedentary "jobs that exist in significant numbers in the national economy."

10. Robertson has not been under a "disability" as defined in the Act since the November 8, 2010 filing date of his application.

It is against that backdrop that this Court must perform its task.

## Standard of Review and Applicable Law

This Court reviews the ALJ's decision as Commissioner's final decision, reviewing the legal conclusions de novo and factual determinations with deference (Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir.2005)). Because factual determinations receive deferential review, courts "are not to reweigh the evidence or substitute [their] own judgment for that of the ALJ" and will affirm Commissioner's decision "if it is supported by substantial evidence" (id.). But as Haynes further explains, "the ALJ must build a logical bridge from the evidence to his conclusion" (id.).

Hence "[i]f the Commissioner's decision lacks adequate discussion of the issues, it will be remanded" (<u>Villano v. Astrue</u>, 556 F.3d 558, 562 (7th Cir.2009)).

Credibility determinations receive an even more deferential review. Courts can reverse or vacate an ALJ's credibility findings only when the findings are "patently wrong" (<u>Elder v. Astrue</u>, 529 F.3d 408, 413–14 (7th Cir.2008)). Still, ALJs commit reversible error when they ground their credibility determinations upon "errors of fact or logic" (<u>Allord v. Barnhart</u>, 455 F.3d 818, 821 (7th Cir.2006)).

To qualify for benefits a claimant must be "disabled" within the meaning of the Act (<u>Liskowitz v. Astrue</u>, 559 F.3d 736, 739 (7th Cir.2009), citing Section 423(a)(1)(E)). "Disability" is defined in Section 423(d)(1)(A) as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

<u>Craft v. Astrue</u>, 539 F.3d 668, 673-74 (7th Cir. 2008) sets out the customary five-step inquiry prescribed by Reg. § 416.920 for determining whether a claimant is disabled. That inquiry involves an assessment of (1) whether the claimant is currently engaging in substantial gainful activity, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment meets or equals a listed impairment, (4) the individual's RFC and whether he can perform his past relevant work and (5) whether the claimant is capable of performing other work. For that purpose Robertson can establish disability at any time between his application date of November 2, 2011 and the present (see Reg. §§ 416.200, 416.202(g)).

## **Flaws in the ALJ's Opinion**

Robertson contends that the ALJ erred in several respects: (1) that she erred in finding his cervical spondylosis and related neck problems were not severe impairments; (2) that the ALJ's analysis of Listing 1.02A failed to account for Robertson's avascular necrosis; and (3) that the RFC analysis contained a multitude of analytical flaws. Though any mistaken failure to categorize Robertson's neck problems as severe would be a harmless error, Robertson's other two contentions merit remand.

First, because the ALJ classified several of Robertson's other impairments as severe, any error in failing to categorize Robertson's neck problems as severe was harmless. Arnett vs. Astrue, 676 F.3d 586, 591 (7th Cir. 2012) so teaches, reasoning that severity "is a threshold issue only." If an ALJ determines that "there exists even one severe impairment," she "must continue on to the remaining steps of the evaluation process" (id., emphasis in original).

That said, whether or not Robertson's neck problems were considered "severe," the ALJ had a duty to consider any impact that those problems may have had on his RFC (Reg. § 416.945(a)(2)). ALJ Bruning concluded that there was no evidence to suggest the neck problems extended beyond August 2010, the last time at which Robertson sought treatment for complaints about shoulder pain associated with his neck injury, and she said that even then there was "no clinical evidence of a medically determinable impairment" underlying that pain (R. 27). That statement is false, however, for while the doctor did not announce a specific diagnosis, he observed a reduced range of motion in Robertson's shoulder and concluded the problem was "possibly cervical radiculopathy" (R. 579). Moreover, Robertson testified at the hearing that he suffered from shoulder pain that made reaching difficult (R. 54-55) -- pain that was associated with his neck injuries (R. 344). Because an ALJ has a duty to consider all relevant lines of

evidence and resolve any material inconsistencies (<u>Herron v. Shalala</u>, 19 F.3d 329, 333 (7th Cir.1994)), the ALJ should have considered and addressed those facts in the RFC analysis.

As for Robertson's second contention, ALJ Bruning did err in determining whether Robertson satisfied Listing 1.02A, "Major dysfunction of a joint(s) (due to any cause)" (Reg. Pt. 404, Subpt. P., App'x 1), because she did not properly analyze whether Robertson's avascular necrosis satisfied the listing requirements. Listing 1.02A requires findings of "gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankyloses, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion . . . and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)" with the "[i]nvolvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively" (App'x 1, Listing 1.02A). "Inability to ambulate effectively" is defined in turn as the "extreme limitation of the ability to walk" (App'x 1, Listing 1.00(b)(1)) and includes but is not limited to "the inability to walk a block at a reasonable pace on rough or uneven surfaces" (App'x 1, Listing 1.00(b)(2)).

Although ALJ Bruning determined that Robertson suffered from severe avascular necrosis in both his right and left hips (R. 26) and provided extensive detail as to the evidence regarding that ailment, she did not explain why it failed to meet the Listing 1.02A requirements. More specifically, she did not explain either (1) why avascular necrosis, which is defined as the death of bone cells, would not give rise to a gross anatomical deformity and bony destruction or

(2) why Robertson had not lost his ability to ambulate effectively.[11]  Neither party disputes that Robertson met the Listing requirement of chronic joint pain and stiffness.

Commissioner contends that Robertson's avascular necrosis had healed, at least on the left side.  While that may be true, the necrosis had lasted for over a year -- a precondition for a disability finding -- and the healing took place after Robertson filed his application for SSI (compare R. 618 with R. 761).

Additionally, the ALJ found that Robertson had severe avascular necrosis on the right hip -- and neither party disputes that conclusion despite what may seem to be equivocal evidence supporting that finding.  In any case, nowhere in her opinion did the ALJ determine that the right side had healed.  And as Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002) instructs, "regardless [of] whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ." In this instance the ALJ determined that there was bilateral avascular necrosis but failed to address whether the avascular necrosis on the right side satisfied any Listing requirement.

Even if Robertson's avascular necrosis met the requirements for gross anatomical deformity and resulting bony destruction, Commissioner argues that Robertson fails to meet the Listing 1.02A requirements because he has not lost his ability to ambulate effectively.  In that respect Commissioner contends that ineffective ambulation requires the use of a device that "limits the functioning of both upper extremities" (App'x 1, Listing 1.00(b)(1)), and Robertson

---

[11]  Indeed, the opinion in Pickett v. Astrue, 11-cv-0160-SEB-DML, 2012 WL 4470242 at *3 (S.D. Ind. Sept. 27, 2012) remanded that case to Commissioner where the ALJ there had not analyzed the evidence of avascular necrosis and had not explained why it did not show a gross anatomical deformity.  Of course our Court of Appeals regularly (and properly) reminds us that District Court opinions carry no precedential weight.

does not need anything more than a cane. But as already mentioned, ineffective ambulation also encompasses such difficulties as the inability to walk a block at a reasonable pace on rough or uneven surfaces or the inability to carry out routine activities such as shopping and banking (Moss v. Astrue, 555 F.3d 556, 562-63 (7th Cir. 2009) (per curiam)). Robertson arguably meets those criteria.

Of course those several errors would not warrant remand if they were harmless -- but they are not. Errors are harmless only if the Court is "satisfied that no reasonable trier of fact could have come to a different conclusion" (Sarchet v. Chater, 78 F.3d 305, 309 (7th Cir.1996)). While the record may perhaps not be so clear that it can "yield but one supportable conclusion" in favor of disability (Campbell v. Shalala, 988 F.2d 741, 744 (7th Cir.1993)), it clearly cannot be said that no reasonable trier of fact would reach that conclusion.

To turn to Robertson's third contention, the ALJ also made a number of analytical errors in arriving at the conclusion that Robertson had the RFC to work. Because those missteps, taken together, cannot possibly be harmless error, they collectively provide a second ground for remand.

1.    Failure To Credit Robertson's Allegations of Pain

Perhaps the most egregious flaw in the ALJ's RFC determination is her two-sentence decision to discredit entirely Robertson's allegations of pain (R. 33):

> The claimant's allegation of disability relied primarily on his testimony that he experienced pain severe enough that he was unable to perform any work-related activity. However, the medical evidence does not support the extent of the claimant's allegation.

Although an ALJ's credibility determinations receive deferential review and can be reversed or vacated only where "patently wrong" (Elder, 529 F.3d at 413-14), ALJs have special obligations

as to a claimant's allegations of pain.  So long as an individual has a medically determinable

impairment capable of causing pain (such as Robertson's repeated problems with his hips), the

ALJ may not reject his statements about that pain solely because objective medical evidence

does not substantiate them (Reg. § 416.929(c)(2); SSR[12] 96-7p).

In fact, the "absence of objective medical evidence supporting an individual's statements

about the intensity and persistence of pain or other symptoms is only one factor that the

adjudicator must consider in assessing an individual's credibility and must be considered in the

context of all the evidence" (SSR 96-7p).  To that end an ALJ has a duty to "carefully evaluate

all evidence bearing on the severity of pain and give specific reasons for discounting a claimant's

testimony about it" (Martinez v. Astrue, 630 F.3d 693, 697 (7th Cir. 2011)).

In this instance Robertson has severe medical impairments that are capable of causing

pain.  Moreover, the medical record is replete with Robertson's complaints about that pain, and

doctors have consistently prescribed medication to control it.  By not addressing those relevant

facts the ALJ failed entirely to draw a logical link from the evidence to his conclusion that

Robertson's testimony was not credible (see, e.g., Shauger v. Astrue, 675 F.3d 690, 697-98 (7th

Cir. 2012)).

2.      ALJ's Substitution of Her Own Medical Opinion

ALJ Bruning committed further reversible error when she arbitrarily determined that

Robertson had the RFC to sit for 45 minutes at a time, with 1 to 2 minute breaks, for a total of 6

hours per day.  No medical evidence supported that conclusion -- a state agency doctor opined

that Robertson could sit for 6 hours at a time, while Robertson testified that he could sit for only

20 minutes at a time.  ALJ Bruning gave the agency opinion "little weight" because "evidence

_____

[12]  That is the well-known acronym denoting Social Security Rulings.

received at the hearing level indicated the claimant was more limited than the consultant had assessed" (R. 35). Yet rather than credit Robertson's testimony or seek further medical opinions, the ALJ decided to "split the baby" and concluded Robertson could sit for 45 minutes at a time.

That violates the clear command repeated in <u>Rohan v. Chater,</u> 98 F.3d 966, 970 (7th Cir. 1996) that "ALJs must not succumb to the temptation to play doctor and make their own medical findings," an often-voiced teaching that cases such as <u>Blakes ex rel. Wolfe v. Barnhart</u>, 331 F.3d 565, 570 (7th Cir.2003) reframe as precluding ALJs from substituting their own opinions to fill gaps in the record. While a claimant bears the burden of proving disability, the ALJ conducting a Social Security hearing has "a duty to develop a full and fair record" (<u>Nelms v. Astrue</u>, 553 F.3d 1093, 1098 (7th Cir.2009)) and to "recognize the need for additional medical evaluations" where the evidence is insufficient (<u>Scott v. Astrue</u>, 647 F.3d 734, 741 (7th Cir.2011)). That is particularly important here, for RFC assessments "must be specific as to the frequency of the individual's need to alternate sitting and standing" because that need can significantly alter the occupational base (SSR 96-9P). ALJ Bruning was not entitled simply to assume an arbitrary frequency, and her failure to develop the record is "good cause" for a remand (<u>Smith v. Apfel</u>, 231 F.3d 433, 437 (7th Cir. 2000)).

> 3.      <u>Improper Assessment of Impact of Plaintiff's Mental Impairments on RFC</u>

Robertson further contends (1) that the ALJ erroneously concluded that Robertson had only "moderate limits" (as opposed to "marked limits") in concentration, persistence and pace and (2) that, regardless of whether his limits were moderate or marked, the ALJ failed to incorporate his mental limitations into the RFC analysis. Robertson is correct on both counts.

First, the ALJ concluded, contrary to the psychological consultant's conclusion that Robertson had "marked" limits in concentration, persistence, and pace, that Robertson's limits

were only "moderate." Even though a later RFC assessment reached the same conclusion as the ALJ's ultimate judgment that Robertson's limits here were only "moderate," ALJ Bruning did not appear to rely on that later assessment -- quite to the contrary, she discounted its conclusions on the ground that it did not adequately incorporate Robertson's "self-reported limitations" (R. 35). Instead the ALJ determined that Robertson had only "moderate" limits because (1) Robertson had held "semi-skilled work" in the past (R. 31), (2) at the time of the hearing Robertson was not receiving treatment for any mental impairment and had been deemed by one physician as "psychiatric stable" (R. 34), (3) on the day that the psychological consultant concluded that Robertson was "markedly" limited in his concentration, persistence and pace, Robertson had clearly related his medical history to another doctor without apparent difficulties (R. 34) and (4) Robertson could drive, pay attention for five minutes, finish what he started and do "okay" in following written instructions (R. 31).

In so concluding, the ALJ failed to draw the requisite logical bridge from the evidence to his conclusion. For one thing, it is unclear why Robertson's past work should bear on his present ability to concentrate. Additionally, while the failure to seek treatment can undermine a claimant's credibility, the ALJ had a duty to explore Robertson's reasons for his failure to seek mental health care before drawing any negative inference (Shauger, 675 F.3d at 696). Moreover, the fact that Robertson could provide a medical history has no logical bearing on his ability to sustain concentration and pace over a work day, and assessments by doctors looking for physical ailments have been found insufficient in the past to contradict psychological evidence (see, e.g., Wilder v. Chater, 64 F.3d 335 (7th Cir. 1995)). Finally, Robertson's ability to drive and to complete certain activities does not clearly undermine the conclusion that Robertson's

concentration, persistence and pace were markedly limited -- Robertson may well have been capable of performing limited tasks but may not be, for example, very efficient at doing so.

But even if the ALJ properly concluded that Robertson had only "moderate limits" in this area, she failed to incorporate that into the RFC analysis. In posing hypotheticals to the VE, ALJ Bruning made no mention of Robertson's limited concentration, persistence and pace. Rather the ALJ described an individual who could complete "simple repeated routine 3-to 4-step tasks." [13] But as such cases as O'Connor-Spinner v. Astrue, 627 F.3d 614, 620 (7th Cir. 2010) teach:

> In most cases, however, employing terms like "simple, repetitive tasks" on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace.

Indeed, "[t]he ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity" (id.). While the VE indicated that he had read the record, it is inappropriate to assume that the VE filled in the gaps in the hypothetical "where, as here, the ALJ poses a series of increasingly restrictive hypotheticals to the VE, because in such cases we infer that the VE's attention is focused on the hypotheticals and not on the record" (id. at 619).

Additionally, it may be noted that the ALJ did not analyze Robertson's GAF scores.[14] Low GAF scores in and of themselves are "insufficient to overturn an ALJ's finding of no disability" (Bates v. Colvin, 736 F.3d 1093, 1099 n.3 (7th Cir. 2013)), but those scores in context

---

[13] It is unclear why the ALJ concluded that Robertson was capable of completing routine three-to-four step tasks when the psychological consultant confined Robertson to one-to-two step tasks. Regardless, the VE did identify one job that requires completion of only one-to-two step tasks and that exists in sufficient numbers in the national economy. Though this error would be harmless in isolation, this Court cannot so conclude when it is combined with the host of other errors and omissions.

[14] See n. 9.

may "reveal the ALJ's insufficient consideration of all the evidence" (id.). In this case Robertson's GAF scores tend to support other evidence that the ALJ simply disregarded, such as the psychological consultant's conclusion that Robertson was markedly impaired in his ability to concentrate and familial observations regarding his ability to function. This too, then, supports the broader conclusion that the ALJ did not adequately analyze Robertson's mental limitations in making the RFC determination.

        4.    <u>Failure To Credit Robertson's Wife and Aunt</u>

ALJ Bruning discredited the opinions of Robertson's wife and aunt on three grounds: first, that neither was a treating source; second, that Robertson's wife's testimony that she helped Robertson to dress and bathe was not supported by "objective evidence"; and third, that each had a personal or proprietary interest in the outcome of the case. But on analysis, those grounds do not support the ALJ's conclusion.

While ALJs are accorded significant deference in evaluating credibility, "errors of fact or logic are not binding on the court" (<u>Allord</u>, 455 F.3d at 821). ALJ Bruning's first two reasons for discrediting Robertson's wife and aunt represent such errors. Even if neither Robertson's wife nor aunt was a treating source and so could not opine on the existence of medical impairments, their opinions "may provide insight into the severity of the impairments and how it affects the individual's ability to function" (SSR 06-3P). And as to ALJ Bruning's determination that no "objective evidence" supported the allegation that Robertson's wife helped Robertson to bathe and dress, it is unclear what kind of "objective" evidence could possibly bolster such an intimate insight.

Finally, ALJ Bruning's decision to discredit Robertson's wife and aunt on the ground that they had an interest in the case is, at least in effect, not unlike the boilerplate that our Court of

Appeals has repeatedly criticized (see, e.g., <u>Parker v. Astrue</u>, 597 F.3d 920, 922 (7th Cir. 2010)). Use of a single generic reason -- untethered to the facts of this case -- to ignore entirely Robertson's wife's and aunt's opinions creates the impression that the ALJ first "decided . . . that the plaintiff was capable of full-time work, and having made that decision naturally had to brush aside" the opinions of Robertson's family (<u>Goins v. Colvin</u>, 764 F.3d 677, 681 (7th Cir. 2014)).

Moreover, SSR 06-3P specifically provides for consideration of the "evidence provided by other 'non-medical' sources such as spouses, other relatives, friends, employers, and neighbors." As that SSR goes on to say, while "there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these 'other sources'. . . when such opinions may have an effect on the outcome of the case"; factors to consider include "the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence" (SSR 06-3P).

Hence the fact that an individual might have a personal or proprietary interest in the outcome of a case does not automatically mean that they should not be credited at all -- on the contrary, the Social Security Administration recognizes that such testimony can be extremely valuable, and <u>Garcia v. Colvin</u>, 741 F.3d 758, 761 (7th Cir. 2013) teaches that the ALJ should not flatly discredit an interested witness' testimony based upon the potential for bias.[15] By disregarding Robertson's familial opinions and Robertson's own pain allegations, the ALJ

---

[15] Of course the ALJ can reduce the weight that he accords an interested witness' testimony where, for example, other evidence contradicts that testimony (see <u>Limberopoulos v. Shalala</u>, 17 F.3d 975, 978-79 (7th Cir. 1994) (overruled in another and unrelated respect by <u>Johnson v. Apfel</u>, 189 F.3d 562-63 (7th Cir. 1999))).

effectively ignored an entire line of relevant evidence as to Robertson's ability to function on a day-to-day basis.

## Conclusion

For numerous reasons stated here, both Rule 56 motions are denied, but Robertson's motion to remand is granted. In that respect this Court is of course well aware that the decision as to the handling of a case on remand is to be made by Commissioner and not by the Article III judge or judges who conducted a review of the initial decision, and this Court has always respected that principle. That said, however, this Court would consider itself remiss if failed to say that the discussion that has gone before certainly appears to call for a fresh pair of eyes on remand. In comparable situations our Court of Appeals has found it appropriate to urge a reassignment on remand on a number of occasions (see, e.g., Terry v. Astrue, 580 F.3d 471, 478 (7th Cir.2009) (per curiam) and cases cited there), and this Court does the same here.

_____
Milton I. Shadur
Senior United States District Judge

Date: February 12, 2015